UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | Case Number: 21mj609 |
| RAYMOND GLOVER, | : | |
| | : | Detention Hearing: November 15, 2021 |
| Defendant. | : | |

**GOVERNMENT'S MEMORANDUM IN RESPONSE TO DEFENDANT'S MOTION
FOR RECONSIDERATION (R. 12)**

During the first week of October, the Court held a contested hearing in the Raymond Glover case, a hearing in which the Court carefully considered the factors under 18 U.S.C. § 3142(g) and the presumption of detention that exists under that statute. Now, Glover moves for this Court to reconsider its well-thought out decision. (R. 12). Glover suggests that a different party, one without a criminal history, could be his third-party custodian. As an initial matter, it is not clear that a defendant's discovery of a different possible third-party custodian provides a legal basis for a motion for reconsideration. But, assuming it can, the existence of a third-party custodian is not sufficient to protect the community.

As detailed below, there are countless examples of offenders like Glover violating the terms of pretrial release by victimizing additional children, something this Court cannot afford to risk, particularly in a case in which there is every suggestion that it is likely to occur. And, the examples provided below occurred in districts in which, as a condition of release, offenders agreed to unannounced home visits and searches by Pretrial, something that is not possible in this district. Perhaps most terrifying, these violations happened despite Pretrial's ability to conduct home visits, and worse, Pretrial would never have even been aware of the continued

1

victimization of children for at least one of the offenders below had unannounced home visits and searches not been an option.

There is a presumption of detention in cases like this one for a reason – Congress has recognized the seriousness of these offenses, the importance of protecting children, and that offenders are driven by a compulsion that is not easily deterred. Certainly Glover, who was on his computer watching a video depicting a child being raped when the FBI executed the search warrant at 6:00 a.m., has that compulsion.

## FACTUAL BACKGROUND

The factual background from the Government's prior motion for detention is reiterated below. Since the date of the last hearing, over 50 additional child pornography videos and images have been discovered on Glover's laptop, in the Telegram app, and on his iPhone. These videos and images include depictions of infants and toddlers, as well as sadomasochistic conduct.

In April of 2021, HSI executed a search warrant at the residence of S-2. S-2 was a member of an 18-person group on Application A. Many of those group members have been apprehended and the investigation has been ongoing for more than a year. During that time, law enforcement has discovered that some group members were actively abusing children, sharing production images with the other group members, and threatening to kidnap children. S-2 admitted to being a member of this group on Application A as well as a second group and stated that he had sexually abused a five-year old child. HSI agents examined his devices and learned that the second group he was a member of was a 49-person group devoted to the exploitation of children. The purpose of the group appeared to be live streaming sex abuse images of children to the group. Agents observed that 130 links had been shared in the group, many from Mega and DropBox. Mega removed links finding that they contained "objectionable content, such as Child Exploitation

Material, Violent Extremism, or Bestiality." The DropBox links were no longer valid. Agents also observed a number of posts related to the exploitation of children.

A few examples of these posts are:

    a. August 30, 2019, by a deleted account warned other users in the group to use a specific technology to obfuscate efforts to locate them and said, "It's always fun to beat a (police officer emoji)."

    b. September 12, 2019, by a deleted account, "Anyone have any boy vids they wanna trade"; "I can trade boy vids hit me up"; "Can someone unlock room? Any rooms?"; "Anyone wanna trade boy Vids?"

    c. September 15, 2019, "lookin to join a small nepi room with a couple hot extreme pervs hmu"

    d. September 26, 2019. "Any nepi rooms? Looking to get twisted and blow my load"; "OMG, you are a fucking sick twisted pervert nepi pedophile!!! That is wonderful!!!"

    e. November 17, 2019, "Fuck ya I want to raise boys with another pedo, train those boys how to smoke meth by 8  Then how to self slam by ten"; "I want them sitting on my cock when they do  We will "gape" their asses"

"Nepi" refers to an individual who is attracted to toddlers and infants. On April 1, 2020, Glover posted in the chat that he had lost access to his old "ring account" and provided his gmail account, an account that contains portions of his name as well as "dc." The search warrant of his Gmail account revealed many emails with his name and address. The Google Drive account contained child pornography and child erotica files, to include videos of a

prepubescent male being anally penetrated by another minor male and a minor male having oral sex with another minor male. These two videos were dated January 21 and January 26, 2020. One was titled "Two Brothers 9yo and 13yo … suck cock…." Another was titled "!14…BJ." (The file names have been redacted to prevent further dissemination of child pornography).

Agents confirmed Glover's address and executed a search warrant at that address in D.C. on September 21, 2020. Glover lived alone in a one-bedroom apartment. When they arrived at 6:00 a.m., Glover's laptop and connected monitor were displayed on his desk in the living room. A child pornography video was playing on one screen. The video depicted an infant being orally penetrated and vaginally raped by an adult male. On another screen, a number of adult males appeared to be watching and masturbating. Glover stated that he had just logged into this Application, (a different social media application, hereinafter Application B). Application B is similar to Web-Ex or Microsoft Teams. Users can see video of other users and live stream or share video. The adult males who were in the room masturbating had their videos on, and it appeared that someone was sharing the child pornography to the room. Glover denied having paid attention to what was going on in the room, stating that he had been on the phone with a friend.

Glover further stated that he had thoughts about self-harm and that he had attempted suicide the week before the search warrant. Agents seized 13 electronic devices, to include two phones, the laptop, and a number of others. Glover confirmed that all the devices were his and that he had lived alone at the residence since January of 2021. He admitted to being on Application A and acknowledged seeing child pornography shared in that application. He provided his phone passcode and stated that agents would find child pornography on his phone. He also admitted that other users would post links that he followed that led him to child

4

pornography. He estimated the youngest children he had collected child pornography of were about five to six-years old. He said that he had been a member of four different Application A chat groups, but was now only a member of three. On the phone, which is connected to an Application A account, agents discovered that Glover was in several different Application A groups and that the groups were primarily devoted to the exploitation of children. They also observed that Glover had clicked on and saved numerous of the child pornography files that were shared in these groups.

Within a few minutes, agents observed over 25 videos of child pornography. Some examples include:

  a. A video approximately 1 minute and 23 seconds in length. This video file depicts a prepubescent female who is penetrated by an adult male's penis in her vagina.

  b. A video file approximately 52 seconds in length. This video file depicts a prepubescent female who is penetrated by an adult male penis in her vagina.

  c. A video file approximately 30 seconds in length. This video filer depicts an adult male who penetrates a female infant with his finger in her vagina.

Glover also said that he had referenced having children in chats on Application A, telling other users he was a "true" dad. Finally, agents learned that Glover worked exclusively from home and that there was a daycare in the building where he lived. They also discovered approximately a gram of methamphetamine on the desk next to the laptop and monitor where the child pornography was playing.

## **APPLICABLE LEGAL STANDARD**

Under 18 U.S.C. § 3142(f), a "hearing may be reopened before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue of whether there are conditions of release that will reasonably assure the appearance of [the defendant] as required and the safety of any other person and the community." "Reconsideration is permissible under this section only when there is new information that would materially influence the judgment about whether there are conditions of release which will reasonably assure that the defendant will not flee and will not harm any other person or the community." *United States v. Cisneros*, 328 F.3d 610 (10th Cir. 2003).

The crime of receipt of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(2), is a felony offense under Chapters 110, and, as such, a crimes of violence that under 18 U.S.C. § 3142(e)(3)(E) create a rebuttable presumption that the defendant constitutes a danger to the community, and that no pretrial release condition or combination of conditions may be imposed to ensure the safety of any other person and the community. This presumption "operate[s] at a minimum to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985).

In determining whether the defendant has overcome that presumption, the Court must consider the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g). Even when the defendant has offered

evidence to rebut the presumption of dangerousness, the presumption remains a factor in the court's analysis of the § 3142(g) factors. *See United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1983) ("Use of that word [rebutted] in this context is somewhat misleading because the rebutted presumption is not erased. Instead it remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)."). As the Sixth Circuit has observed, "[t]he presumption [of dangerousness] remains as a factor because it is not simply an evidentiary tool designed for the courts. Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." *United States v. Stone*, 608 F.3d 939, 945-46 (6th Cir. 2010) ("To rebut the presumption, therefore, a defendant should 'present all the special features of his case' that take it outside 'the congressional paradigm.'").

## **ANALYSIS**

For the reasons that follow, the Government maintains that the existence of a new potential third-party custodian is not sufficient to ensure the safety of the community and prevent the further victimization of children.  Glover received and shared child pornography in four different groups of like-minded individuals, used sophisticated technology to obfuscate law enforcement efforts, and was actively watching child pornography when agents arrived at his door.  Glover had dozens and dozens of child pornography images and videos on several different devices (to include his laptop, iPhone) and in his Google Drive account and in the Telegram application.  These videos and images depicted the worst imaginable abuse of infants and toddlers and some depicted sadomasochistic conduct.

Every red flag has been raised when it comes to his behavior.  Moreover, children are at risk now more than ever from this kind of victimization. The pandemic has not slowed crime.  If

anything, it has created more opportunities for the exploitation of children (both online and at home). *See, e.g.,* Laura Santhanam, Why Child Welfare Experts Fear a Spike in Abuse During COVID-19, PBS, (Apr. 6, 2020) www.pbs.org/newshour/health; Sakshi Venkatraman, *Experts Fear Child Abuse will Increase with Coronavirus Isolation*, NBC News (Mar. 27, 2020) https://www.nbcnews.com/news/us-news/experts-fear-child-abuse-will-increase-coronavirus-isolation-n1170811.

Contrary to the defendant's motion, the existence of a different third party custodian does not solve for the problem or adequately protect the public. There are countless examples of similarly situated offenders who the Court gave the benefit of the doubt, only to learn that they had further victimized children or put children at-risk while on pretrial release. And, examples like these occurred in districts where defendants had similar conditions: home detention or a curfew, GPS/tether, and limited or no access to electronic devices. Worse, these kinds of violations occurred in districts where Pretrial had the ability to conduct home visits, something Pretrial cannot do here.[1]

To give just four examples:

**Marc Horrigan 19-20017[2]**

On October 29, 2018, defendant Marc Horrigan was granted pretrial release by a U.S. Magistrate Judge. Amongst other conditions, he was not permitted to possess a smart phone with Internet access, he had to report the use of any other electronic devices which were subject

---

[1] Pretrial also had the ability to order a psychosexual evaluation for each child exploitation offender and order psychiatric care/counseling.

[2] The four cases listed herein are cases that Detroit Pretrial supervised. All four were cases in the Eastern District of Michigan. Caruso is the only one of the four that did not involve distribution, receipt, and possession of child pornography. In that case, the defendant was charged with transportation of obscene material for sending graphic photos of himself to a minor. The Adam Walsh Act therefore applied to all offenders except for Caruso.

to computer monitoring software, he could only use such devices at his home, he was subject to unannounced home and vehicle searches at any time, and he was not permitted to reside or visit anywhere within 100 yards of a school, daycare, or other location where children congregate. (R. 5). He was also on a GPS/tether and a curfew. *Id.* In November of 2018, on a home visit (something Pretrial does not do in this district), Pretrial discovered an Internet-capable device at the defendant's residence. They seized the device immediately (something that could not be done had there not been a home visit). Thereafter, Horrigan was indicted on distribution, receipt, and possession of child pornography charges. In May of 2019, Pretrial conducted a second, unannounced home visit. During the home visit, they discovered that Horrigan had a laptop, which was hidden under several blankets. Pretrial asked Horrigan to turn the laptop on. In an open window on the laptop, there was a depiction of a prepubescent female posed seductively, wearing only a bra and underwear. The defendant's desktop and wallpaper was a different photograph that was sexually explicit of a prepubescent female. Horrigan admitted that he had purchased the laptop three weeks prior at a resale shop using cash and that he had paid for Internet access at the residence without informing Pretrial. He acknowledged downloading sexually explicit images and videos of children while on release.

**Matthew Johnson 20-20291**

On July 13, 2020, Matthew Johnson, charged with distribution, receipt, and possession of child pornography, was placed on Pretrial release. Amongst other things, Johnson had a GPS/tether, was required to obtain psychiatric treatment, allowed to have only an Android phone and a tablet and only with Pretrial's computer monitoring software on it, subject to home and vehicle visits by Pretrial at any time, and required not to reside or visit any location within 100 yards of any school, day care center, park, or other place where children congregate. (R. 7). On

March 11, 2021, Pretrial conducted a random monitoring software check on the defendant's devices and observed that Johnson had been reviewing numerous sexually explicit and graphic images and videos of children. They discovered that he had been doing so for months. In other words, because they cannot check the software at every moment (and the software itself is not perfect), it appears that Johnson was able to revictimize many children from November of 2020 all the way through the revocation of his release conditions in March of 2021.

**Thomas Caruso 18-20227**

On April 6, 2018, Caruso was charged by Information. (R. 1). He was released with conditions, including but limited to unannounced home visits and searches, no use of electronic devices except as required for employment (and that device was to have the computer monitoring software installed), a requirement to obtain psychiatric or medical treatment, and travel restrictions. (R. 7). On June 6, Caruso entered a guilty plea to transfer of obscene material in front of a U.S. District Court Judge. (R. 10). A few months later, on September 19, the mother of a minor victim reported that Caruso was engaging in sexually explicit conversations with her daughter over SnapChat. (*See* R. 23 Govt. Sent. Mem.; *see also* R. 17 Order Revoking Bond; R. 12 Pretrial Petition for Revocation). The minor victim reported that the two had exchanged images that were graphic in nature and that he had sent her photographs of his penis. *Id.* She said that Caruso knew that she had been in and out of the hospital for suicide attempts. *Id.* Caruso told her about the federal search warrant at his home and about his federal case. *Id.* He said that law enforcement had not found one of his laptops and that he still secretly possessed it. *Id.* While on Pretrial release, Caruso told suicidal MV-2, "Can you get out for a few minutes in about an hour?" *Id.* He sent her an address and a place to meet. *Id.* He also sent her a screenshot

10

of "Hotspot VPN" to explain how he had been able to evade law enforcement while using his unauthorized electronic device in violation of his bond. *Id.*

Two weeks later, while Sterling Police continued to investigate the incident, Caruso remained free and Pretrial and the Government remained unaware of the minor victim's report or the fact that Caruso was utilizing a computer without monitoring software.  The Government then received a call from the defense-hired psychosexual expert who was then working on writing a psychosexual report to support the defense position at sentencing.  *Id.*  The expert reported that Caruso had told him he had sexually explicit conversations with two different minor victims while on pretrial release, and that one of the two minors had contacted the police. *Id.*

**Jared Lockwood 16-20008**

On December 17, 2015, Lockwood was charged with receipt, possession, and access with intent to view child pornography (R. 1).  A U.S. Magistrate Judge granted Pretrial release, provided Lockwood did not possess or access any electronic devices, submit to location monitoring and GPS/tether, and abide by other conditions.  On March 24, 2016, Lockwood entered a guilty plea to possession of child pornography.  He possessed a total of 122 images and 73 videos of child pornography.  Thereafter, Lockwood informed the Government through his attorney that he knew of someone who was going to detonate pipe bombs.  A friend of Lockwood's came forward and told the Government that Lockwood had devised a scheme, all while on Pretrial release and on a tether, to frame a friend of his by manufacturing pipe bombs and then planting them at the friend's residence.  Lockwood planned to "cooperate" against the friend (who he knew to be a felon) to get a lower sentence.  Lockwood's back-up plan was to

flee and fake his own death, something he had learned about from the Pedophile's Handbook, a book advising pedophiles on what to do if they get caught.

According to the friend, Lockwood had been secretly accessing the Internet at his house for months. In fact, Lockwood was still logged-in to his Amazon account at the friend's house. Also, while on a tether, subject to home visits, and barred from accessing electronic devices, Lockwood purchased pipes from a Home Depot (later proven by surveillance footage), powder from a gun shop (later proven by receipt), and other items to make the pipe bombs that he later planted. The FBI conducted an emergency operation, discovering four pipe bombs that were in fact operational.[3]



**<u>Operational Pipe Bombs Manufactured while on a Tether by Lockwood</u>**

---

[3] Meanwhile, Lockwood was also terminated from his job and failed to inform Pretrial Services. Because Pretrial Services did not know about the termination, his curfew hours remained the same. When he finally did tell Pretrial Services, he asked for permission to work at a friend's residence. He convinced his friend to sign receipts showing he had worked, when in fact, he had not done any work, nor had he been paid to work there. He then fraudulently submitted those receipts to Pretrial Services. The Defendant told the Court at a hearing on May 10, 2016 that he had been to his friend's house a total of five times, but the tether data and Lockwood's friend confirmed that he has been over to his friend's residence a minimum of twelve times in a one-month period.



**Lockwood buying pipe at Home Depot while on a GPS/Tether**



**CONCLUSION**

The cases above are illustrations of the compulsion many of these offenders have to continue engaging in this activity.  All four of them were in therapy, had a psychosexual evaluation as a condition of Pretrial release, had stringent conditions, and were warned that committing an offense while on Pretrial release could result in an additional decade in prison Yet, these offenders, which were some of the few child exploitation offenders released, found ways to go back to engaging in illegal activity.  One of them harmed a child by directly trying to meet up with her and engaging in explicit chats with her despite knowing her fragile state.  Two others revictimized a dozen or more children by continuing to seek out and watch graphic videos of these children being terribly abused.  And a fourth followed the recommendations of the Pedophile's Handbook, while also repeatedly accessing the Internet and electronic devices he was not permitted to access.  In the meantime, he manufactured four operational pipe bombs while on a tether with the goal of framing a friend for his crime.  One of the offenders purchased the Internet and a new device, another used one that he never disclosed to Pretrial he had, a third used a friend's device, and the fourth utilized a device he knew was being monitored by Pretrial. Unfortunately, Pretrial did not learn of the content even on that device until four months later, after many children had already been revictimized by the offender.  The risks to children of release for an offender like Glover, who was using sophisticated technology, participating in numerous groups, and saving child pornography in multiple different platforms and devices, and who was so addicted that he was watching a video of young child being raped the day of the search warrant, are too great.  His case is exactly why Congress has stated that a rebuttable presumption of detention exists and that the crime of distributing and receiving child pornography is a crime of violence.  There are no condition or combination of conditions that

14

would ensure the safety of the community if Glover were to be released.

        Respectfully submitted,

        MATTHEW GRAVES
        United States Attorney


        By: _____/s/ April N. Russo_____
        April N. Russo
        Assistant U.S. Attorney
        PA Bar: 313475
        U.S. Attorney's Office for the District of Columbia
        555 Fourth Street NW, Fourth Floor
        Washington, DC 20530

Date: November 12, 2021

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I caused a copy of this pleading was served on all counsel of record via the Court's electronic filing service.

>*/s/ April N. Russo*
>April N. Russo
>Assistant United States Attorney

Date: November 12, 2021